# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

DENNIS BORROUSCH,      )
                                       )

          Plaintiff,      )
                                       )

      vs.                 )      **3:17-cv-00126-PPS**
                                       )

AETNA LIFE INSURANCE    )
COMPANY,                   )
                                       )

          Defendant.     )

## OPINION AND ORDER

Plaintiff, Dennis Borrousch, brings this ERISA claim against Aetna Life Insurance Company seeking review of Aetna's termination of long term disability benefits under the plan sponsored by his former employer. Borrousch and Aetna have filed cross motions for summary judgment, the resolution of which will conclude this case. I must apply the deferential arbitrary and capricious standard of review in this case. After conducting a lengthy review, I find that the termination of benefits and denial of appeal are supported by a reasonable explanation based upon evidence in the administrative record. Therefore, I will grant Aetna's motion for summary judgment.

### Undisputed Facts

Borrousch worked for Boyd Gaming from 1988-July 31, 2013, working his way

up to Director of Operations of its casino and hotel. [C.F. 1740-41.][1] He was diagnosed with HIV in 1986, but continued working for many years thereafter. [C.F. 15.] Borrousch eventually retired in July 2013 due to chronic symptoms of HIV including neuropathy, cognitive impairment, chronic fatigue, and depression. [Compl., DE 1, at ¶¶ 9-10.]

As an employee of Boyd, Borrousch was covered under a long-term disability (LTD) insurance policy issued by Aetna as part of his benefit plan. [*Id.* at ¶¶ 6-7.] The plan delegates discretionary authority to Aetna to make benefit determinations. [Plan 36.] The plan's "Test of Disability" is:

> From the date that you first became disabled and until monthly benefits are payable for 24 months you meet the test of disability on any day that:
>
> - You cannot perform the **material duties** of your **own occupation** solely because of an **illness, injury** or disabling pregnancy-related condition; and
>
> - Your earnings are 80% or less of your **adjusted predisability earnings.**
>
> *After the first 24 months of your disability* that monthly benefits are payable, you meet the plan's test of disability on any day you are unable to work at any **reasonable occupation** solely because of an **illness, injury** or disabling pregnancy-related condition. [Plan 49 bolding and italics in original.]
>
> Reasonable Occupation

---

[1] The parties cite to the extensive administrative record by internal Bates-stamped page numbers which include the plan documents ("Plan" Bates numbered Plan 1-76, and the "Claim File" or "CF" Bates numbered Claim File 1-3446). For simplicity's sake, I will do the same.

This is any gainful activity:

- For which you are, or may reasonably become, fitted by
education, training, or experience; and

- Which results in, or can be expected to result in, an income
of more than 60% of your **adjusted predisablity earnings**.
[Plan 68 (bolding in original).]

Aetna originally denied Borrousch's request for benefits, but following a lawsuit

and notice of settlement, Aetna notified Borrousch on August 31, 2015, that it would

start paying $2,495 monthly LTD benefits under the policy.  [C.F. 1527-30, 341-42.]

Aetna paid these benefits throughout and a little beyond the 24-month "own

occupation" benefit period (from January 27, 2014 through February 17, 2016).  [DE 1, at

¶¶ 13-14; Plan 49.]

During this time frame, Borrousch also applied for disability benefits from the

Social Security Administration ("SSA").  On June 5, 2015, Borrousch received a letter

from the SSA stating:

You said that you became unable to work on 07/05/2013 because
of HIV Aides [sic.], depression, mental confusion and brain fog,
chronic inflammation and joint pain, and psoriatic arthritis.  While
you stopped work because of your condition, you do not meet our
requirements for disability until 1/30/2015.  Specifically, we look at
your ability to function with your medical condition.  Then we
consider your age, education and past work for determining
disability.  The rules allow us to find you disabled as early as
07/30/2014 which is near your 55th birthday.

[C.F. 1510.]  On December 14, 2015, Dr. Nagle performed weight loss surgery on

Borrousch.  [C.F. 977-80.]

On January 8, 2016, Annette Swain, Ph.D. (Clinical Psychology, Neuropsychology) conducted a review of all the record evidence at the request of Aetna.  Borrousch received a letter from Aetna dated February 19, 2016, stating his LTD benefits were terminated effective 2/17/16 for the reasons explained in the letter.  [C.F. 379.]  The letter states that Aetna's review included, but was not limited to, medical records from Dr. Ronald Gonzales (Borrousch's primary care physician and infectious disease specialist), Dr. Gregory Sarlo (Psychology), Northstar Healthcare, and lab results from his medical providers.  [*Id.*]

Because I am reviewing the reasonableness of the denial, the language in Aetna's letter is important and I will quote it at length below:

> You were sent for an independent Neuropsychological evaluation and testing with Dr. Gregory Sarlo on 11/12/15 by your Attending Physician, Dr. Gonzales.  A clinical consultant as well as a Board Certified Clinical Psychologist/Neuorpsychologist reviewed all the available medical information provided by your medical providers.  Based on medical records on file there is insufficient medical evidence for an impairment that would preclude you from reaching, handling, and frequent talking.  There was no evidence of cognitive impairments or impairing medication.  There does not appear to be any physical or neurological findings that would support any sensory deficits of either hand or lower extremities concerning standing and fine motor manipulation.
>
> After a complete review of the Neuropsychological Evaluation and your file, we contacted Dr. Gonzales on 1/7/2016 to discuss why he indicated you were unable to work.  After Dr. Gonzales reviewed your information, he concluded that you were capable of working in a full time occupation, both physically as well as cognitively.  Your behavioral health difficulties appear to be pharmacologically managed and you continue to attend therapy. Your records do not support that your symptoms are functionally

> impairing or require any restrictions and limitations in your daily
> functioning.
>
> Our clinical assessment of your medical records in the file do not
> endorse any restrictions or limitations [t]hat would preclude you
> from work activities that would be considered sedentary in
> physical demand.

[C.F. 380.] Aetna then set forth the results of a wage survey, finding that Borrousch

could be a manager (touring production); manager (golf club); and booking manager,

which were jobs within his physical capacity, in the labor market in his area, and

salaries which are equal or greater than $29.07 an hour (60% of his adjusted pre-

disability earnings).  [*Id.*]

The two doctors referred to in Aetna's letter are Dr. Sarlo and Dr. Gonzales.

During Dr. Sarlo's independent psychological evaluation on November 12, 2015, he

administered a number of tests.  Borrousch's performance on one test, the WAIS-IV,

indicated average verbal comprehension skills, perceptual reasoning abilities, working

memory abilities, and processing speed skills.  [C.F. 1379.]  His executive functioning

skills appeared intact and his performance indicated no difficulties in motor

functioning.  [C.F. 1387, 1390.]  However, Dr. Sarlo also noted in his report that

Borrousch was experiencing a high level of stress and anxiety, that he felt

overwhelmed, and that he had a "poor ability to retain and recall visual, motor, and

working memory information" and his emotional impairments, severe depression,

anxiety, and chronic medical conditions "prevent him from working."  [C.F. 1390-91.]

Dr. Sarlo opined that Borrousch had difficulty with "delayed memory and bilateral

functioning" and that it was "highly likely memory loss will continue with progression of HIV." [C.F. 1391-92.] Dr. Sarlo recommended that Borrousch apply for disability benefits due to his physical health concerns and emotional functioning issues. [C.F. 1392.]

The other doctor referred to in Aetna's letter is Dr. Gonzales, Borrousch's long term primary care provider. Dr. Gonzales had previously submitted an Attending Physician's Statement ("APS") back on August 20, 2014, stating Borrousch suffered from HIV, moderate cognitive dysfunction, recent memory loss, HIV-associated dementia, polyneuropathy, and major depressive disorder, and concluding he was unable to work and was totally disabled. [C.F. 2680-83.] Dr. Gonzales did another APS on October 15, 2015, confirming the same, and concluding Borrousch had no ability to work and that he expected his disability to be permanent. [C.F. 1468-69.]

During Dr. Swain's review for Aetna, she reached out and had a telephone conversation with Dr. Gonzales on January 7, 2016. Dr. Swain reported that Dr. Gonzales said Borrousch had a strong remote memory, but poor recent memory, and that he believed Borrousch's cognitive and emotional problems were brought on by his highly stressful job. [C.F. 3339-40.]

Before terminating Borrousch's benefits, Aetna sent Dr. Swain's physician review report to Dr. Gonzales for his review and comment. When asked if he agreed with the conclusions in the report, Dr. Gonzales checked the box "yes." [C.F. 1369.] When asked if he agreed that Borrousch is capable of performing full-time sedentary physical

demand level work from a physical and cognitive perspective, Dr. Gonzales again checked the box "yes." [*Id.*]

Borrousch appealed the termination of his benefits arguing, among other things, that it was not reasonable for Aetna to rely on the form Dr. Gonzales completed confirming he could work at the sedentary level. [C.F. 849-55.] The appeal included a May 5, 2016 APS from Dr. Gonzales (contradicting the earlier form he completed), diagnosing Borrousch with HIV/AIDS, polyneuropathy, major depressive disorder, progressive visual disturbance, blurring of vision, moderate memory loss, diabetes mellitus type 2, and cognitive disorder, and indicating that Borrousch could work for no hours per day, and he was currently disabled from performing the material duties of any occupation. [C.F. 886-88.] Dr. Gonzales also reported that Borrousch's GAF score improved to 70 and the only medication side effect was sexual side effects. [C.F. 886-87.] The appeal package also included an APS from Dr. Chandler (internal medicine), which noted a 70 GAF, but also concluded that Borrousch could work 0 hours per day, and that he was disabled from working any job because he "has memory and cognitive deficits which preclude from meaningful employment. Other problems include neuropathy." [C.F. 986-90.]

At the request of Borrousch's primary care provider, on June 22, 2016, a neuropsychological exam was completed by Dr. Reilly (Psychology). Dr. Reilly noted that even though "the following results may underestimate [Borrousch's] true cognitive abilities" due to engagement and motivation issues, Borrousch still scored in the

average range across the primary indices.  [C.F. 900-906.]  Dr. Reilly opined that Borrousch's "neuropsychological profile is not consistent with that observed in the setting of HIV related cognitive impairments" and suggested that his subjective cognitive complaints might be the result of his depressive mood and anxiety symptoms. [C.F. 905.]

While the administrative appeal was pending, Aetna did a little digging.  It hired a private investigator who discovered that Borrousch had started two businesses, and that he was the registered agent for both which were filed on September 23, 2016.  The investigator also discovered that Borrousch owned properties he was flipping, and that he had obtained a real estate license.  He was also a realtor for a third company in which he had two new home listings in October 2016.  [C.F. 232-33, 642-52, 663-775, 1474-96, 3070.]  The video surveillance of Borrousch did not reveal any activities.  [DE 28.]   Aetna sent a letter to Borrousch's attorney on October 17, 2016, informing her of the public information they uncovered, and placing the review on hold until November 15, 2016, so Borrousch could produce his tax returns.  [C.F. 403.]  Following a review of Borrousch's 2013-2015 tax returns, Aetna determined that Borrousch deducted business mileage that translated to him driving 2,400 miles per month.  [C.F. 661-62, 776-838.]

On November 16, 2016, Dr. Jeremiah Stubbs (Board Certified Occupational Medicine) reviewed the appeal records for Aetna.  In his report to Aetna, Dr. Stubbs noted that Dr. Gonzales concluded Borrousch could work at the sedentary level on the form that he checked and signed, but then later "recanted" and said Borrousch could

not work due to neuropathy and cognitive dysfunction. [C.F. 655.] Dr. Stubbs reviewed Dr. Chandler's findings, noted the 70 GAF, an abdominal ultrasound, and went through other medical documents such as an abdominal/pelvic CT scan from June 28, 2016. [C.F. 655-57.] Dr. Stubbs concluded that based on the medical documentation provided, "there was no evidence of a physical condition which could lead to a functional impairment. There were no physical exam findings, imaging studies, or diagnostic test results that supported restrictions/limitations during the period under review." [C.F. 657.] Dr. Stubbs also indicated that the information in Borrousch's tax documents about his business mileage "is generally based on self-reports and is not useful as evidence to support or refute claims of impairment." [C.F. 658.]

A week after Dr. Stubbs issued his report, Aetna denied Borrousch's appeal. In the denial of appeal letter, Aetna set forth the reasons behind its decision to uphold the termination of benefits which can be summarized as follows: (1) the records revealed Borrousch's involvement in other businesses; (2) his ability to drive extensively "which shows he has the cognitive ability, mental and physical capacity, and ability to focus in order to safely operate a motor vehicle;" (3) Dr. Gonzales' signed and dated statement agreeing that Borrousch could return to work at a sedentary level; (4) a residual functional capacity exam completed by the SSA which concluded that Borrousch had a light level capacity; (5) the May 2015 psychology exam concluding he had a mild neurocognitive disorder with depression but continued to be able to understand and

follow complex instructions and tasks; and (6) the change in the plan's definition of what is a disability that occurred as of January 27, 2016.   [C.F. 406-07.]  Finally, Aetna attempted to distinguish the approval Borrousch received from the Social Security Administration because its findings were based on his age.  [*Id.*]

## Discussion

Both Borrousch and Aetna now seek summary judgment.  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A nonmoving party is not entitled to the benefit of "inferences that are supported by only speculation or conjecture."  *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (citations and quotations omitted).

With respect to an employee benefit plan governed by ERISA, a plaintiff may bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. §1132(a)(1)(B).  In interpreting an ERISA plan, I apply general principles of contract law consistent with federal common law on ERISA claims.  *See Cheney v. Standard Ins. Co.*, 831 F.3d 445, 450 (7th Cir. 2016); *see also Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 659 (7th Cir. 2005) (*citing Bock v. Computer Assocs. Int'l, Inc.*, 257 F.3d 700, 704 (7th Cir. 2001)).

I consider the denial of benefits *de novo* unless the plan grants the plan administrator discretionary authority to construe policy terms. *Cheney*, 831 F.3d at 449-50 (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). As I alluded to above, Aetna has granted itself discretionary authority in the Policy which means I must apply a deferential "arbitrary and capricious standard." *Sisto v. Ameritech Sickness & Accident Disability Benefit Plan*, 429 F.3d 698, 700 (7th Cir. 2005); *see also Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008).

Under this standard, I have to uphold the plan's decision "as long as (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem." *Sisto*, 429 F.3d at 700 (quotation omitted). While the standard is a deferential one, it "is not a euphemism for a rubber stamp." *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 483 (7th Cir. 2009).

A plan's decision is not reasonable if "its determination ignores, without explanation, substantial evidence that the claimant has submitted that addresses what the plan itself has defined as the ultimate issue." *Id*. at 484. Moreover, it is not my function to decide if I would have reached the same conclusion as the plan. *Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004) . Rather, "[i]f the administrator made an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts, then that decision is final." *Id.* Finally,

ERISA requires that "specific reasons for denial be communicated to the claimant and that the claimant be afforded an opportunity for full and fair review by the administrator." *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 688-89 (7th Cir. 1992) (internal quotations omitted). Borrousch voices both substantive and procedural concerns with the termination of benefits and denial of appeal.

### Termination of Benefits

Borrousch claims that Aetna's record reviewer did not provide substantial evidence to support termination of the claim, and that the termination was unreasonable. But in looking at the reasons given by the plan administrator for the termination of Borrousch's benefits, I cannot say that Aetna's action was "downright unreasonable." *Black v. Long Term Disability Ins.*, 582 F.3d 738, 745 (7th Cir. 2009).

Annette Swain (Clinical Psychology, Neuropsychology) reviewed the medical records from Dr. Gonzales, Dr. Sarlo, Northstar Healthcare, and lab results from the medical providers. [C.F. 379.] While Borrousch repeatedly argues that it was unfair that Dr. Swain was a psychologist, and that she did not personally interview Borrousch, there is no case law stating a claimant is entitled to ERISA review by a certain type of doctor, or a personal interview. It is not inherently unreasonable for a plan administrator to rely on the opinions of doctors who review records in making disability determinations. *Black*, 582 F.3d at 745. Indeed, this happens all the time. As the Seventh Circuit has recognized, "[i]n such file reviews, doctors are fully able to evaluate medical information, balance the objective data against the subjective opinions

of the treating physicians, and render an expert opinion without direct consultation."
*Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 577 (7th Cir. 2006). "ERISA does not
require plan administrators to arrange for an independent medical examination before
denying or terminating benefits." *Clark v. Cuna Mut. Long Term Disability Plan*, No. 14-
cv-412-wmc, 2016 WL 1060344, at *9 (W.D. Wis. Mar. 15, 2016) (citing *Davis*, 444 F.3d at
577). Moreover, while a claim administrator cannot simply ignore or misconstrue
favorable evidence to a claimant, it is "entitled to disagree with a treating physician, or
to discount some reports in favor of other evidence it finds more credible - so long as it
explains and supports its decision to do so." *Holzmeyer v. Walgreen Income Protection
Plan for Pharmacists and Registered Nurses*, 44 F.Supp.3d 821, 838 (S.D. Ind. 2014)
(citations omitted) .

In the termination of benefits letter, Aetna cited the neurological tests performed
by Dr. Sarlo which indicated average verbal comprehension skills, perceptual reasoning
abilities, working memory abilities, and processing speed skills on the WAIS-IV test.
[C.F. 1379, 1390.] While it is true that Dr. Sarlo also found profound impairment in
visual learning suggesting Borrousch "experiences significant difficulty in holding
visually presented information in his short-term memory" [C.F. 1385], a plan
administrator need not "annotate every paragraph of a thousand-page medical report."
*Majeski*, 590 F.3d at 484. As the Seventh Circuit has noted, "[r]aising debatable points
does not entitle [the claimant] to a reversal under the arbitrary-and-capricious
standard." *Sisto*, 429 F.3d at 701.

Additionally, it cannot be said that Aetna disregarded the opinion of Dr. Gonzales, the primary care physician. Dr. Gonzalez gave conflicting information. It is true, on the one hand, that Dr. Gonzales wrote an APS in August 20, 2014, and October 15, 2015, both concluding that Borrousch had zero capacity to work. And if this was all that was in the record from Dr. Gonzales, Aetna's decision to terminate probably would have been unreasonable. But as part of the review process, Dr. Swain actually called Dr. Gonzales to obtain his opinion about Borrousch. [C.F. 1407.] According to Dr. Swain, Dr. Gonzales said Borrousch had a strong remote memory, but poor recent memory, and that he believed Borrousch's cognitive and emotional problems were brought on by his highly stressful job. [C.F. 3339-40.] Additionally, Dr. Gonzales said that Borrousch's underlying HIV was controlled and that his emotional condition was not affecting his physical condition. [C.F. 3340.]

What's more, in determining whether Aetna's decision was arbitrary and capricious, one of the most telling things in the record is Dr. Gonzales' completion of the form sent by Aetna on January 13, 2016. [C.F. 1369.] In the letter, Aetna is up-front that it is assessing Borrousch's medical conditions, level of functionality, and ability to work in any reasonable occupation for his claim of Long Term Disability benefits. [*Id.*] It then details the independent review by Dr. Swain, thanks Dr. Gonzales for speaking with her, and encloses a copy of Dr. Swain's physician review report for Dr. Gonzales' review and comment. [*Id.*] Dr. Gonzales checked "yes" that he agreed with the conclusions outlined in Dr. Swain's report (he was invited to provide the medical basis

for his opinion if he checked "no"), and "yes" that he agreed Borrousch is capable of performing full-time sedentary physical demand level work from a physical and cognitive perspective. [*Id.*]

Borrousch has characterized this form as a "simple and ambiguous" contradiction of Dr. Gonzales' previous findings [DE #35 at 7], and notes that Dr. Gonzales never provided any explanation for his checking of the boxes [DE #37 at 3]. But it is this lack of explanation that concerns me. While I can see how it would be possible for a busy physician to accidentally check the wrong box on a form, there was no way for Aetna to know if this was a mistake, but there were ways for Dr. Gonzales to remedy it (if indeed, it was accidental). Dr. Gonzales could have called up Aetna, or he could have signed an affidavit explaining the problem. Yet nowhere in the record does Dr. Gonzales directly address this form at all, or give any explanation whatsoever for it. Rather, about 4 months later (after Borrousch had already appealed the decision and learned that Dr. Gonzales agreed with Aetna's assessment), Dr. Gonzales then drafted another APS in line with his previous ones, saying Borrousch could not work at all. [C.F. 889.] This is all a bit perplexing.

Looking at the record at the time Aetna reviewed the benefits and terminated them, there is a signed letter from Borrousch's primary care physician stating he agreed with Dr. Swain's report and that he agreed with the opinion that Borrousch is capable of performing full-time sedentary work. Aetna included in its termination letter explanation that "your physician, Dr. Gonzales, agrees with our assessment you could

perform full time work at the sedentary level." [C.F. 381.] This seems like the opposite of arbitrary and capricious to me, where the reviewing doctor for Aetna consulted the claimant's primary care doctor, talked to him on the telephone, sent him a copy of the report, asked for his opinion, and was told unequivocally (and without further discussion or attempt to directly change the form), that the patient was capable of performing full-time sedentary work.

Aetna gives additional support for its conclusion to terminate by adequately addressing the decision by the SSA. First, Aetna is not bound by the SSA's determination to award benefits. *See Mote v. Aetna Life Ins Co.*, 502 F.3d 601, 610 (7th Cir. 2007); *see also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003)(distinguishing disability determination made by SSA which is measured against a "uniform set of federal criteria" from ERISA disability determination that turns on "interpretation of terms in the plan at issue."). Aetna does acknowledge the SSA's disability finding but then distinguished it: "we are unable to give it significant weight in our determination, and we find that you are not (or you are no longer) eligible for LTD benefits based on the plan definition of Totally Disabled quoted above." [C.F. 381.] Aetna noted that, "[t]he information provided indicates your claim was approved based on Social Security's vocational rules." [C.F. 381.] Indeed, the Social Security Notice found that Borrousch did "not meet our requirements for disability until 1/30/2015" and that after considering his age, education and past work, the rules allowed it to find him disabled as early as 7/30/2014, which is near his 55th birthday. [C.F. 1510.]

Additionally, Aetna explained that its review of Borrousch's current functional capacity, education and work history identified full time reasonable wage occupations. [C.F. 381.] There is evidence from the independent SSA review that supports this position. Dr. Devers conducted a psychological exam at the request of the SSA, which confirmed Borrousch could understand and follow complex instructions and complete complex tasks, and even though it was "unlikely" he could successfully navigate his previous job, he could perform a number of work related tasks at a lower level of difficulty and complexity. [C.F. 1132-38.] Additionally, while Borrousch did have some difficulty with memory tasks, overall his IQ remained high. [C.F. 1128.] A medical exam by an SSA selected physician confirmed Borrousch had normal gait, the ability to ambulate without an assistive device, and appropriate judgment and insight. [C.F. 1358-62.] Finally, a Functional Capacity Assessment determined Borrousch could lift up to 20 pounds occasionally and 10 pounds frequently, and he could stand/walk 6 hours and sit 6 hours out of an 8-hour workday. [C.F. 1126-31.]

In sum, I think the termination letter offers a reasonable explanation for the outcome of termination of benefits, which is based upon facts in the record. This claim file is huge, and there is no doubt that there is some conflicting medical evidence in the record, especially when it comes to Borrousch's memory. But I do not think Aetna impermissibly cherry-picked information from the record. There is no requirement that an administrator discuss every single piece of evidence. To the contrary, the Seventh Circuit has made clear that an ERISA plan administrator is not required to expressly

address each piece of evidence in an adverse benefit determination.  *See Gallo v. Amoco Corp.*, 102 F.3d 918, 922 (7th Cir. 1996) ("[t]he district judge went astray by requiring that the plan administrator articulate the grounds for the interpretation in the course of reviewing an adverse determination on a claim for benefits, as if the plan administrator were an administrative agency.  There is no such requirement in the law.").

Borrousch strenuously contends that Aetna improperly ignored the opinions of his three main treating physicians, Dr. Gonzales, Dr. Sarlo, and Dr. Chandler.  It is true that Dr. Sarlo recommended that Borrousch apply for disability benefits [C.F. 1392] and that both Dr. Gonzales and Dr. Chandler concluded at some point that Borrousch had no ability to work.  [C.F. 2680-83, 1469, 986-90.]  There are inconsistencies with the medical evidence in this case, but there are tests and indicators in the medical record, including the assessments made by the SSA, that Borrousch could function at the sedentary work level and his cognitive function was in the average range.  [C.F. 868-84, 1378, 1390, 1132-38, 1358-62, 1126-31.]  The argument that "the opinions of treating physicians deserve special consideration in benefits determinations" has been "rejected."  *St. Clare v. Unum Life Ins. Co. of Am.*, No. 1:11-0067-JMS-MJD, 2012 WL 1666619, at *13 (S.D. Ind. May 11, 2012) (quoting *Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 832 (7th Cir. 2009)).  Indeed, the Seventh Circuit has acknowledged that some treating physicians do not really add to a case where they are merely conduits for a patient's subjective complaint that he is unable to work.  *See Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004) ("Most of the time,

physicians accept at face value what patients tell them about their symptoms; but [administrators] must consider the possibility that applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk)." Sometimes, a treating physician can act "more as an advocate than a doctor rendering objective opinions." *Davis*, 444 F.3d at 578.

Plan administrators cannot arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician, but "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan*, 538 U.S. at 834. "A satisfactory explanation is one that gives the specific reasons for the denial, but it need not explain the reasoning behind the reasons, . . . [that is,] the interpretative process that generated the reason for the denial." *Herman v. Cent. States, Se. & Sw. Areas Pension Fund*, 423 F.3d 684, 693 (7th Cir. 2005) (quotation omitted).

Here, in her medical review report to Aetna, Dr. Swain does thoroughly describe her detailed review of the findings of Borrousch's doctors and how she believes they misinterpreted some of the data from tests, how some of their findings were not supported by medical evidence, and why she disagreed with their ultimate conclusions that Borrousch could not work at all. [C.F. 1401-05.] According to the Seventh Circuit, such a decision should not be disturbed. *See Semien v. Life Ins. Co. of N. Am.*, 436 F.3d

805, 812 (7th Cir. 2006) (finding where Plan's reviewing doctors disagreed with treating physicians, "under an arbitrary and capricious review, neither this Court, nor the district court, will attempt to make a determination between competing expert opinions"); *Black*, 582 F.3d at 745 (under the deferential standard of review, where there "is essentially a contest of competing medical opinions," the Court must defer to the Plan's choice "so long as it is rationally supported by record evidence.").

Before I move on to the appeal, Borrousch also argues that Aetna's vocational review was flawed and improper. Under the Aetna policy, Borrousch is disabled if he is unable to perform the material duties of any gainful occupation for which he is or may reasonably become fitted by education, training, or experience and which results in or may be expected to result in an income of more than 60% of his adjusted predisability earnings ($29.07 per hour per Aetna's calculations). [Plan 68.] Borrousch argues that Aetna improperly cites a broad category of occupations in which only 180 people are employed throughout the state of Michigan, and that "median" wage data should have been used instead of "mean." [DE 30 at 18-19.] The only support Borrousch gives for the argument that a median data set should have been used instead of a mean, is an article that he did not submit during the appeal review, and thus I cannot consider since it is outside the administrative record. *Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan*, 195 F.3d 975, 981-82 (7th Cir. 1999).

Finally, while Borrousch criticizes the only vocational review in the record, he does not submit his own vocational evidence. It seems especially disingenuous for

Borrousch to now attack the interpretation of Bureau of Labor Statistics data, when the record reveals that Borrousch was able to work at the time, had two businesses, his realtor license, and drove frequently for his business.

**Denial of Appeal**

As with the termination of benefits, I also think the denial of appeal was based upon sufficient information and Aetna gave a reasonable explanation to Borrousch. The appeal denial explained the reasoning behind the decision, including the full-time sedentary work release from Dr. Gonzales, the plan's definition of disability change, the social media and internet search which identified Borrousch had an active real estate license, he was the registered agent of Borrousch DBF LLC, which was an active Indiana LLC with an estimated revenue of $110,000, he filed for two new businesses in September 2016, and according to his tax records, he drove approximately 2,400 miles per month. [C.F. 406.] Aetna found that the driving activity "in combination with his multiple business ventures directly contradicts Mr. Borrousch's report that he does not have the functional capacity to work." [C.F. 406.] The appeal also summarized the independent review of Dr. Stubbs, who found there was no clinical evidence of any condition that would result in a functional impairment, and no physical exam findings, imaging studies, or diagnostic tests that supported any restrictions or limitations. [*Id.*]

Aetna acknowledged that Borrousch felt that "Aetna falsely reported that Dr. Gonzales agreed Mr. Borrousch could return to work, however, as you have seen in your copy of his claim file, Dr. Gonzales signed and dated a statement agreeing that Mr.

Borrousch could return to work at a sedentary level." [C.F. 407.] The fax was stamped by NorthStar Medical. [*Id.*] Aetna again distinguished the SSA's award of benefits and set forth the findings of the SSA exams, including that Borrousch had light level capacity and could perform work related tasks at a lower level of difficulty and complexity. [*Id.*] Finally, it concluded that "since there is no clinical evidence of a functional impairment that would prevent Mr. Borrousch from performing the material duties of any reasonable occupation, as outlined in the termination letter dated February 19, 2016, the decision to terminate benefits is upheld." [*Id.*]

During his review for the appeal, Dr. Stubbs examined Dr. Gonzales' APS dated May 5, 2016, and noted that Dr. Gonzalez now found that Borrousch could stand for only 15 minutes at a time, sit for 15 minutes at a time and sit for 60 minutes during a work day, could do no lifting, bending, or stooping and was reportedly disabled from performing the material duties of any occupation. [C.F. 656.] Dr. Gonzales also reported that Borrousch's GAF score improved to 70.[2] [C.F. 886-92, 656.] Dr. Stubbs concluded that the clinical information on file did not support a functional impairment for the time frame under review, January 27, 2016 through November 30, 2016. [C.F.

---

[2] While not dispositive of disability questions, and of limited value in this case because the GAF score "has limited value in determining whether a [claimant] can engage in substantial gainful activity," *Sparks v. Colvin*, No. 1:14-CV-1519, 2015 WL 3618344, at *6 (S.D. Ind. June 8, 2015), it has been said that GAF scores represent "on a single day an individual's overall level of functioning, including symptom severity." *Gordon v. Astrue*, No. 3:11-CV-237 CAN, 2012 WL 967049, at *1 n.1 (N.D. Ind. Mar. 19, 2012); *Richards v. Astrue*, 370 Fed.Appx. 727, 728 n.1 (7th Cir. 2010) (GAF scores of 51-60 indicate moderate symptoms; 61-70 indicate mild symptoms).

657.] He noted that the information obtained from tax documentation about Borrousch's business driving did "not impact [his] medical opinion regarding the presence of a functional impairment" since information on tax documents was generally self-reported and is not useful as evidence to support or refute claims of impairment. [C.F. 658.] Dr. Stubbs also considered the records for Borrousch's weight loss surgery that was completed successfully, without mention of infectious or immune disorders. [C.F. 655.]

Borrousch claims that the tax information and his alleged "business activities" are new reasons to justify the termination of benefits, and any reference to them is an impermissible post-hoc justification. He goes further to argue that he was "impermissibly sandbagged" and denied his right to a full and fair review. [DE 35 at 17-24.] I disagree. On October 17, 2016, Aetna sent a letter to Borrousch's attorney informing them of the review of public information, discovery that Borrousch owned two businesses, and that he had obtained a real estate license and worked as a real estate agent since at least 2014. [C.F. 403.] Aetna placed the review on hold until it received further documentation "[t]o determine the accuracy of this information and the possible impact to his claim." [*Id.*] Surely at this point, after Aetna disclosed what it found during its review of public information, Borrousch was on notice that this additional information was being considered by Aetna during the appeal process. Borrousch could have produced additional evidence to the contrary, or responded to this information if he so chose. This information was all within Borrousch's personal

knowledge, and he was on notice that Aetna was considering it during the appeal process.

Contrary to Borrousch's argument that Aetna terminated the claim for one reason and denied the appeal for another, the appeal denial found "there is no clinical evidence of a functional impairment that would prevent Mr. Borrousch from performing the material duties of any reasonable occupation" [C.F. 407] and the initial termination similarly concluded that the medical records "do not endorse any restrictions or limitations [t]hat would preclude you from work activities that would be considered sedentary in physical demand." [C.F. 380.] Thus, while Borrousch's businesses were first mentioned in the denial of the appeal, the crux of the determination still rested on the same conclusion as before - that there was nothing in the record showing he could not do a reasonable occupation. Moreover, Aetna's reviewing physician on appeal, Dr. Stubbs, specifically stated that information obtained about Borrousch's business driving "does not impact my medical opinion regarding the presence of a functional impairment." [C.F. 658.] In other words, Borrousch's discovered business activities are not a new *reason* for denying his claim, but rather just additional evidence used by Aetna to support the initial determination.

While Borrousch contends that every reason for the denial of benefits must be given at the time of the denial, Aetna did not hire an investigator to conduct surveillance or look at Borrousch's business activities online until during the administrative appeal process. [C.F. 232-33, 642-52, 663-775, 3070.] As noted in *Windbiel*

24

*v. Group Short Term Disability*, "[a]lthough the Seventh Circuit has not apparently

confronted the issue directly, it seems unlikely it would adopt the Plaintiff's argument

that an administrator is forbidden from considering additional medical information

during the appeals process." *Windbiel v. Group Short Term Disability*, No. 09-C-139, 2010

WL 2720000, at *4 (E.D. Wis. July 7, 2010).  That Court went on to discuss *Mote v. Aetna*

*Life Ins.*, where the Seventh Circuit approved of a plan hiring a private investigator who

videotaped the plaintiff during the day, and then presented the videotape to the

consulting physician who changed his mind during the appeals process and concluded

the claimant was not disabled.  *Mote v. Aetna Life Ins. Co.*,  502 F.3d 601, 604-05, 613-615

(7th Cir. 2007).  As such, I can't say Borrousch was denied procedural due process when

Aetna investigated his other business affairs.

　　　Borrousch's reliance upon cases addressing post hoc justifications is inapposite.

*Halpin*, 962 F.2d at 696, and *Reich v. Ladish Co. Inc.*, 306 F.3d 519, 525 n.1 (7th Cir. 2002),

are inapplicable because both address an attempt to raise new arguments for the first

time during litigation (not the appeal process, like here).  *Zuckerman v. United of Omaha*

*Life Ins. Co.*, No. 09-CV-4819, 2011 WL 2173629, at *3-5  (N.D. Ill. May 31, 2011), is also

inapplicable because it addressed the reliance on one plan provision to deny the

benefits, and reliance on a different plan provision during the appeal.  Here, Aetna did

not raise this information for the first time during litigation, but instead notified

Borrousch during the appeal process that it had uncovered this information, and Aetna

did not rely on different plan provisions for the initial termination and appeal.  For

these reasons, Borrousch was afforded a full and fair review, and he did have an opportunity to respond to the new evidence.

**Conclusion**

For the aforementioned reasons, Borrousch's motion for summary judgment [DE 29] is **DENIED** and Aetna Life Insurance Company's motion for summary judgment [DE 31] is **GRANTED**.  The Clerk is **ORDERED** to **CLOSE** this case.


**SO ORDERED**.

ENTERED:  June 4, 2018

/s/ Philip P. Simon
**PHILIP P. SIMON, JUDGE**
**UNITED STATES DISTRICT COURT**